## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ZING HEALTH, INC.<br>225 W. Washington Street, Suite 450<br>Chicago, Illinois 60606<br><br>*Plaintiff,*<br><br>v.<br><br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES<br>Hubert H. Humphrey Building<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201;<br><br>CENTERS FOR MEDICARE &<br>MEDICAID SERVICES<br>7500 Security Boulevard<br>Baltimore, MD 21244;<br><br>XAVIER BECERRA, in his official<br>capacity as Secretary of the United States<br>Department of Health and Human Services<br>Hubert H. Humphrey Building<br>200 Independence Avenue, S.W.,<br>Washington, D.C., 20201; and<br><br>CHIQUITA BROOKS-LASURE, in her<br>official capacity as Administrator,<br>Centers for Medicare & Medicaid Services<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>*Defendants.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.  1:24-cv-855 |

## COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Zing Health, Inc. ("Zing"), submits the following Complaint for declaratory and

injunctive relief against Defendants Department of Health and Human Services ("HHS"), the

Centers for Medicare & Medicaid Services ("CMS"), Xavier Becerra, in his official capacity as Secretary of HHS, and Chiquita Brooks-LaSure, in her official capacity as Administrator of CMS (collectively, "Defendants" or "CMS"), and alleges as follows:

**INTRODUCTION**

1.      Zing brings this action to address a serious error that CMS has made in calculating Zing's 2024 Star Ratings, which, if not promptly corrected, will cause Zing to be unfairly terminated from participating in the Medicare Advantage Program, thereby precluding it from serving low-income and minority beneficiaries and undermining its mission of addressing inadequacies in the healthcare system.

2.      This erroneous calculation and CMS's refusal to address it in compliance with its own regulation are a disturbing, if textbook, example of rigid and unreasonable agency decision-making that should be set aside.

3.      CMS disregarded the plain text of its own regulation and adopted an "implied" approach, obscured within regulatory preamble and commentary, to calculate the 2024 Star Ratings.  This new methodology, which was never the subject of any proper rulemaking, improperly reduced Zing's Star Ratings.  That result is directly contrary to the entire purpose of the regulation that CMS misapplied, which is to stabilize Star Ratings and thereby reduce wild, year-over-year ratings swings through use of explicit "guardrails."

4.      Zing was founded in 2019 by physician entrepreneurs and a healthcare executive with the mission to address healthcare disparities among historically underserved populations.  In fact, 83% of the Medicare beneficiaries enrolled in Zing's MA-PD plans are Black or Hispanic and 75% receive low-income subsidies for the Medicare Part D coverage.

5.      Moreover, Zing offers two of only seven available MA-PD HMO plans with Cook County Hospital System that services these underserved beneficiaries with $0 premiums and deductibles, low maximum out-of-pocket costs, and Part D coverage gap coverage.

6.      MA Plans, like Zing, receive annual Star Ratings from CMS based on "health and drug plan quality and performance measures" that are used by Medicare beneficiaries to shop for plans.  CMS also relies on the Star Ratings to determine MA Plans' eligibility to receive quality bonus payments and rebates that fund additional benefits for their Medicare members.

7.      CMS calculates the Star Ratings based on a clear and unambiguous methodology that includes the calculation of measure-specific "cut points."

8.      In 2020, CMS promulgated regulations that revised its Star Ratings methodology to include "guardrails" that provide stability and predictability for MA Plans by reducing the fluctuation in the cut points used to calculate annual Star Ratings.

9.      CMS is required to use actual cut points from the prior year to determine the appropriate cut points that are used to calculate an MA-PD plan's Star Ratings.

10.      But in calculating the 2024 Star Ratings for Zing, CMS applied an entirely different and new methodology that was not subject to any formal notice and comment rulemaking, and that directly contradicted the plain text of its own regulation.

11.      Instead of using actual plan performance data from 2023 to calculate 2024 cut points in accordance with the established guardrails for Star Ratings, CMS recalculated the 2023 cut points by prematurely applying the Tukey outlier deletion method.

12.      When Zing confronted the agency about its use of recalculated data, CMS merely asserted it did not agree with Zing and refused to abide by its own regulation.

13.     The result was catastrophic: Zing's 2024 Part D Star Rating remained low, and became the third and last data point used by CMS to *terminate* Zing's contract from the MA-PD program effective December 31, 2024, threatening its beneficiaries' ability to receive coverage and depriving it of millions of dollars in revenue.

14.     In addition to terminating Zing's contract, CMS also imposed marketing and enrollment sanctions on Zing, which effectively foreclosed new enrollments into Zing's MA-PD plans for the remainder of 2024.

15.     CMS's failure to adhere to its articulated methodology to calculate Zing's Star Ratings constitutes an unexplained and unreasonable departure from its own regulation, which carries dire consequences for Zing and other MA Plans.

16.     CMS's refusal to follow its own promulgated methodology and reliance on flawed data are arbitrary and capricious agency actions in violation of the APA.

17.     CMS's 2024 Star Ratings for Zing should be vacated, and this matter should be remanded to the agency to adjust Zing's 2024 Star Ratings based on a proper application of its regulation and use of data that is not inherently flawed.

18.     To prevent Zing from suffering irreparable harm from CMS's improper rating, the Court should expedite the resolution of this matter on the merits and also enjoin CMS from relying on its improper Part D Star Ratings to terminate Zing's contract with CMS.

## **PARTIES**

19.     Zing is a for-profit corporation incorporated in Illinois, duly licensed as a health maintenance organization in Illinois, and with its principal place of business in Chicago, Illinois.

20.     Defendant HHS is the department of the federal government ultimately responsible for the federal Medicare and Medicaid programs.

21.     HHS has delegated its authority to administer the Medicare and Medicaid programs to CMS.  *See* 66 Fed. Reg. 35437.

22.     Defendant CMS is a federal agency within HHS with the primary oversight responsibility for the Medicare program and the federal portion of the Medicaid program.  It was created by the Reorganization Act of March 9, 1977.  *See* 66 Fed. Reg. 35437.

23.     Defendant Xavier Becerra is named in his official capacity as the Secretary of HHS.  *See* 42 C.F.R. § 405.1136(d)(1).

24.     Defendant Chiquita Brooks-LaSure is named in her official capacity as Administrator of CMS.  The CMS Administrator is responsible for the administration of the Medicare program, including the Star Ratings for MA Plans.  *Id.*

## JURISDICTION & VENUE

25.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 701 *et seq.*, and 42 U.S.C. §§ 1395 *et seq.*

26.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States and a substantial part of the events giving rise to Zing's claims occurred in this District.

27.     The Complaint is timely under 28 U.S.C. § 2401(a).

## REGULATORY AND FACTUAL BACKGROUND

### *The Medicare Program And Star Ratings*

28.     The Medicare program, authorized under Title XVIII of the Social Security Act ("SSA"), is a federal program that provides health insurance benefits for Americans aged 65 years and older and certain disabled persons.  *See* 42 U.S.C. §§ 1395 *et seq.*

29.     CMS is the federal agency responsible for administering the Medicare program.

30.     Individuals enrolled in Medicare may elect to receive their benefits under Part C of the Medicare program, commonly referred to as the "Medicare Advantage" program, as an alternative to original Medicare.

31.     Under Part C, CMS contracts with private insurance payors, commonly known as Medicare Advantage Plans ("MA Plans"), to provide and arrange for Medicare-covered benefits for Medicare beneficiaries who enroll in their benefit plan.  *See* 42 C.F.R. § 422.4.

32.     Most MA Plans also provide Medicare Part D prescription drug coverage.  *See* 42 C.F.R. § 422.4(c)(1).

33.     MA Plans that provide offer Part D coverage are referred to as MA-PD plans.  *See* 42 C.F.R. § 423.4.

34.     Besides arranging and paying Medicare-covered benefits of Medicare beneficiaries, MA Plans typically provide supplemental benefits as well as lower co-payments and other cost sharing, which further reduce the cost of covered services for beneficiaries.

35.     The Medicare Advantage program is intended to shift the financial risk of providing health care to beneficiaries from the federal government to the privately run MA Plans in exchange for a per-member, per-month payment.

36.     MA Plans that are better at keeping their members healthy, by effectively managing their care and providing important related services, receive higher ratings, and overall, perform better in the marketplace.  *See generally* 42 C.F.R. § 422.160.

37.     By providing additional benefits beyond those covered by Medicare, MA Plans compete with original Medicare and with one another to convince beneficiaries to select their plan.

38.     In an effort to encourage MA Plans to offer high quality plans and to assist Medicare beneficiaries in selecting a Part C plan, CMS studies and surveys MA Plans for quality, compliance, and other metrics to develop numerical ratings for each MA Plan ("Star Ratings").

39.     The Star Ratings are based on a five-star scale, with 1 star being the lowest rating and 5 stars being the highest.  *See* 42 C.F.R. § 422.162(b); 42 C.F.R. § 422.166(h)(1)(ii).

40.     MA Plans that also provide Part D coverage receive a separate Part D Star Rating. *See* 42 C.F.R. § 422.162(b).

41.     The Star Ratings are designed to be "a true reflection of the plan's quality" and must be based on data that is "complete, accurate, reliable, and valid."  83 Fed. Reg. 16440, 16521 (Apr. 16, 2018).

42.     Star Ratings information is widely available to Medicare beneficiaries to consider when choosing to enroll in an MA Plan.  These measures are particularly important, as they allow beneficiaries to compare health plans based on quality.

43.     CMS prominently displays Star Ratings in its online and print resources on available MA Plans as required under the Social Security Act ("SSA").  *See* 42 U.S.C. § 1395w–21.

44.     Indeed, through the online Medicare Plan Finder tool, CMS displays MA Plans in highest to lowest Star Ratings order to prospective members, with the express purpose of guiding beneficiaries to higher-rated plans first.

45.     The Star Ratings also impact the amount of funds CMS will pay to each MA Plan.

46.     Under Section 1853(o) of the SSA, CMS allocates quality bonuses to MA Plans based on their Star Ratings and awards additional funds to MA Plans rated at or above 4 stars. *See* 42 U.S.C. § 1395w–23.

47.     MA Plans use these bonuses, which are often in the tens, if not hundreds of millions, of dollars, to provide additional benefits and services to further improve care to their members.

48.     Conversely, MA Plans that consistently receive Star Ratings below 3 stars may be terminated from the Medicare Advantage program altogether.  *See* 42 C.F.R. § 422.510(a)(4)(xi); 42 C.F.R. § 423.509(a)(4)(x).

49.     Thus, the Star Ratings have tremendous value to and impact on MA Plans to provide quality care and benefits to their members, compete in the marketplace, receive compensation, and even remain eligible to continue to participate in the Medicare Advantage program.

### *Calculation Of Star Ratings Generally*

50.     To calculate Star Ratings, CMS must use clear and unambiguous calculations established in its regulations.  *See* 42 C.F.R. § 422.162(b); 42 C.F.R. § 422.166(h)(1)(ii); 42 C.F.R. § 423.182(b); 42 C.F.R. § 423.186(h)(1)(ii).

51.     Star Ratings for MA Plans are based on a calculation of numerous performance measures designed to assess member services and care, including but not limited to preventative health services, management of long-term conditions, member experiences with the health plan, member complaints, and customer service. *See Medicare 2024 Part C & D Star Ratings Technical Notes* at 26-100, CENTERS FOR MEDICARE AND MEDICAID SERVICES, https://www.cms.gov/files/document/2024technotes20230929.pdf.

52.     CMS publishes these measures and the specifications that it uses to develop its Star Ratings.  MA Plans (including Zing) use them to target areas of improvement and investment to ensure they are maximizing their care and services for beneficiaries, and in turn, earn higher Star Ratings.

53.     Any changes to the Star Ratings calculations can have serious, and sometimes catastrophic, impacts on MA Plans.

54.     When Star Ratings fall due to changes in criteria and calculation methodology, MA Plans may be disqualified from receiving quality bonus payments and can even be removed from the Medicare Advantage program altogether, resulting in devastating financial and coverage consequences for MA Plans and beneficiaries.

55.     Therefore, in developing each MA Plan's Star Ratings, CMS must treat each MA Plan "fairly and equally," judging them only on matters that are "under the control of the health or drug plan," in a system that will "minimize unintended consequences" adopted through a "process of developing [a ratings methodology that] is transparent and allows for multi-stakeholder input."  83 Fed. Reg. 16440, 16521.

56.     CMS calculates Star Ratings based on a rigid methodology – set forth in its own regulations – that focuses on "health and drug plan quality and performance measures."  42 C.F.R. § 422.166; Medicare 2024 Part C & D Star Ratings Technical Notes at 2 & 26-100.

57.     Measures used to calculate Star Ratings can be grouped into two categories: those from the Consumer Assessment of Healthcare Providers and Systems surveys ("CAHPS"), and those from "non-CAHPS" sources.  Medicare 2024 Part C & D Star Ratings Technical Notes, at 2 & 26-73.

58.     CAHPS measures relate to member experience with healthcare providers,

services, and plans, deriving data from "surveys that ask consumers and patients to evaluate the

interpersonal aspects of health care."  42 C.F.R. § 422.162(a).  In other words, they measure the

member experience.

59.     Non-CAHPS measures derive data from sources other than CAHPS surveys.  *See*

Medicare 2024 Part C & D Star Ratings Technical Notes, at 4.  Non-CAHPS measures consist of

data from, among other sources, the Healthcare Effectiveness Data and Information Set[1] and

CMS's Part C and D reporting requirements.  *Id.* at i.

60.     Each CAHPS and non-CAHPs measure is given a numeric score.  *Id.* at 2.

61.     The agency then determines the "cut point" for each measure – that is, the range

of scores that correspond with particular Star Ratings.[2]

62.     The statistical method used to calculate the cut points differs for CAHPS and non-

CAHPS measures.  *Id.* at 8.

63.      CAHPS measures employ a relative distribution and significance testing

method,[3] while non-CAHPS measures are subject to a clustering sampling method.  *Id.*

---

[1]  The Healthcare Effectiveness Data and Information Set ("HEDIS") is a tool used by more than 90 percent of U.S. health plans to measure performance on important dimensions of care and service.  More than 190 million people are enrolled in health plans that report quality results using HEDIS. *See* Healthcare Effectiveness Data and Information Set (HEDIS) - Healthy People 2030 | health.gov (last visited Mar. 25, 2024).

[2]  For instance, the 2023 cut points for measure C11 (Controlling Blood Pressure) – which is measured as a percentage – were the following: below 39% for 1 Star, between 39% and 62% for 2 Stars, between 62% and 75% for 3 Stars, between 75% and 83% for 4 Stars, and above 83% for 5 Stars.  *See* Medicare 2023 Part C & D Star Ratings Technical Notes, at 45-47.

[3]  Clustering sampling is defined by CMS as a "variety of techniques used to partition data into distinct groups such that the observations within a group are as similar as possible to each other, and as dissimilar as possible to observations in any other group."  42 C.F.R. § 422.162(a). Clustering of the measure-specific scores means "that gaps that exist within the distribution of the scores are identified to create groups (clusters) that are then used to identify the four cut points resulting in the creation of five levels (one for each Star Rating), such that the scores in

64.     Together, the CAHPS and non-CAHPS measure scores and cut points are combined to develop each MA Plan's Star Ratings.

### *CMS Adopts Guardrail Requirements As Part Of The Star Ratings Methodology*

65.      On June 2, 2020, CMS promulgated a final rule establishing a new methodology for the calculation of Star Ratings.  *See* 85 Fed. Reg. 33796.  The new methodology was supposed to be applied starting in 2021, but was delayed because of the COVID-19 pandemic.

66.     The final rule modified the methodology for non-CAHPS measures in two critical ways.

67.     *First*, the final rule explained that, starting in 2024, the Tukey outlier deletion method would be used in developing the cut points for non-CAHPS measures.  *See* 42 C.F.R. § 422.166(a)(2).[4]

68.     *Second*, and most importantly, the final rule implemented "guardrails" or "bi-directional caps that restrict upward and downward movement of a measure's cut points" from one year to the next.  *Id.*[5]

69.     Specifically, the guardrail prevents each measure's cut points from fluctuating more than 5% (upward or downward) from that of the previous year, thereby promoting stability in Star Ratings year over year.  *See generally* 85 Fed. Reg. 33796-33911.

---

the same Star Rating level are as similar as possible and the scores in different Star Rating levels are as different as possible."  *Id.*

[4]  Tukey outlier deletion is a "standard statistical methodology for removing outliers, to increase the stability and predictability of the star measure cut points."  85 Fed. Reg. 33798.

[5]  A guardrail is defined by CMS as "a bidirectional cap that restricts both upward and downward movement of a measure threshold-specific cut point for the current year's measure-level Star Ratings as compared to the prior year's measure-threshold-specific cut point."  42 C.F.R. § 422.162(a).

70.     CMS thus adopted the guardrail requirement to provide stability and predictability from year-to-year.  *See generally id.*

71.     According to the regulation, CMS is supposed to rely on the actual cut points from the prior year to determine and calculate the guardrail to measure the cut points that ultimately would be used to develop the Star Ratings for the MA Plans.

72.     CMS explained that it would incorporate the "guardrail so that the measure-threshold-specific cut points for non-CAHPS measures do not increase or decrease more than the value of the cap from 1 year to the next."  *Id.*

73.     Under the final rule, therefore, to calculate the 2024 Star Ratings cut points, CMS is required to remove Tukey outliers from its methodology and then apply the guardrail caps for each measure's cut points compared to the actual 2023 cut points.  *See* 42 C.F.R. § 422.166(a)(2)(i).

74.     Doing so is supposed to prevent the 2024 cut points from deviating more than 5% from the 2023 cut points, thereby bringing stability to the calculations and process for MA Plans and Star Ratings.  *Id.*

### *CMS's Arbitrary Rejection Of Its Own Methodology To Develop The 2024 Star Ratings Caused Zing To Receive A Lower Star Ratings*

75.     As a new MA-PD Plan, Zing has struggled to receive high Star Ratings, receiving a 2.5 in both 2022 and 2023.

76.     As previously noted, due to the COVID-19 pandemic, CMS delayed implementing its guardrail requirement for two years until 2023, when it was supposed to use that requirement to establish the 2024 Star Ratings.  *See* 87 Fed. Reg. 22776.

77.     Thus, 2023 was the first time that CMS implemented its guardrail requirement, when it established its 2024 Star Ratings.  *See id.*

78.      Zing's 2024 Part D Star Ratings came in at 2.5 Stars – far lower than its expected 3 Star Rating.

79.      CMS may terminate an MA Plan contract when the Plan does not comply with the regulatory requirements of the Medicare Advantage Program, including if a plan achieves less than a 3-Star rating on Part C or Part D for three years in a row.  *See* 42 C.F.R. §§ 422.510(a)(4)(xi), 423.509(a)(4)(x).

80.      Because of Zing's 2024 Part D Star Rating, Zing had received three Part D Star Ratings below the 3-Star threshold.  Accordingly, CMS initiated termination of Zing's contract.

81.      Zing initiated an administrative appeal relating to the procedures CMS failed to adhere to, including the calculation of its 2024 Star Ratings.

82.      In response to Zing's challenge, CMS advised that "the 2023 Star Ratings cut points were rerun . . . and [t]hese *rerun* 2023 Star Ratings cut points serve as the basis for the guardrails for the 2024 Star Ratings."  *See* Exhibit ("Ex.") 1, CMS Letter to Zing on Jan. 26, 2024.

83.      That is to say, in computing Zing's 2024 Star Ratings, CMS used rerun simulated 2023 cut points data.

84.      But CMS's own regulation requires it to rely on the previous year's *actual* cut points and data – not simulated, rerun data.  *See* 42 C.F.R. § 422.166(a)(2).

85.      Nevertheless, CMS rejected the methodology set forth in the regulation, and refused to consider actual cut points for the prior year.

86.     And the results were just as dire as expected: MA Plans' Star Ratings fluctuated wildly, and well-beyond the 5% caps on cut point swings that the guardrails are supposed to impose.[6]

87.     Thus, Zing's 2024 Part D Star Rating was significantly lower than expected as a result of CMS's failure to apply its own regulations.

88.     Had CMS followed the regulation as written, Zing's Part D Star Rating would have been 3 stars  – which would have precluded CMS from terminating Zing's contract.

89.     CMS's failure to follow its own regulation resulted in the very thing that the guardrails were designed and intended to prevent: wild fluctuations in cut points that impact MA Plans' Star Ratings.

90.     Zing alerted CMS to its flawed methodology, explaining that the regulation requires CMS to apply the guardrail to actual cut points from the prior year, not to rerun data that effectively amount to simulated data points.  *See* Ex. 2, Zing Letter to CMS on Jan. 5, 2024.

91.     Rerunning the 2023 data is inconsistent with the plain and express language of the regulation, which calls for comparison between the current and prior year's actual and measure-specific-threshold cut points.  *See* 42 C.F.R. § 422.166(a)(2)(i).

92.     It also frustrates the very purpose of CMS's guardrail regulation, which is to reduce risk and uncertainty for MA Plans by preventing dramatic swings in cut points and resulting ratings that can have massive adverse impacts on MA Plans and beneficiaries.

93.     By its express terms, CMS's regulation does not permit the agency to recalculate the prior year's cut points for the purposes of generating and applying the guardrails.  *See* Ex. 2.

---

[6]  *See* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data (last visited Mar. 25, 2024).

94.     When confronted with the flaws in its approach, CMS asserted that statements in its preamble to its final rule related to the use of Tukey outliers somehow permitted its departure from the regulation's actual text.  Ex. 1; 85 Fed. Reg. 9044; 85 Fed. Reg. 33833.

95.     Despite Zing's efforts to further discuss and resolve its concerns, CMS refused to meaningfully engage with Zing or reconsider its flawed approach and grave impacts of it.

96.     As such, CMS ultimately used this third flawed Star Ratings – a rating that is not "a true reflection of the plan's quality" – to justify terminating Zing's contract.  83 Fed. Reg. 16440, 16521 (Apr. 16, 2018).

### *CMS's Unlawful Conduct Has Harmed –*
### *And Continues To Harm – Zing*

97.     CMS's refusal to abide its own regulation threatens to cause severe and irreparable harm to Zing.

98.     By applying some newfound "intrinsic" methodology to calculate guardrails, rather than its actual regulation, Defendants have used simulated, rerun data to calculate Zing's Star Ratings.

99.     As a result, Defendants have issued fundamentally flawed Part D and overall Star Ratings for Zing of 2.5 stars.

100.    The impact of Defendants' action is serious and substantial.

101.    By issuing a flawed 2024 Part D Star Rating for Zing's contract, CMS made Zing's contract eligible for termination and did in fact notify Zing that it was terminating Zing's contract program effective December 31, 2024, which will cause Zing to cease operations and discontinue providing services to low socioeconomic and minority beneficiaries.

102.     In reliance of its termination notice to Zing, CMS also imposed marketing and enrollment sanctions on Zing, which prevent Zing from enrolling new beneficiaries in its MA-PD plans for the remainder of 2024.

103.     The flawed Star Ratings, accompanying contract termination and marketing and enrollment sanctions have also undermined Zing's competitive position, reputation, and goodwill.

104.     Additionally, as a result of CMS's flawed rating methodology, beneficiaries will lose their health coverage and be unable to access equivalent care.

105.     Zing has tried to resolve the parties' dispute informally to no avail.  Exs. 1-2.

106.     Left with no other option, Zing turns to this Court to require Defendants to comply with federal law, vacate the flawed Star Ratings assigned to Zing, and enjoin them from relying on that unlawful rating in connection with Zing's eligibility as a Medicare Advantage organization.

## COUNT I
### (Violation Of 5 U.S.C. § 706(2)(A) – Against All Defendants)
### (Use Of Simulated And Rerun Cut Point Data)

107.     Zing realleges the allegations set forth in Paragraphs 1 through 106 of this Complaint as if fully set forth herein.

108.     CMS's decision – as approved and directed by Defendants – to use simulated and rerun 2023 cut point data to calculate Zing's 2024 Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2) and 42 C.F.R. § 422.260(c)(3).

109.     Zing is adversely affected and aggrieved by Defendants' action.

110.     Defendants' decision to use simulated and rerun cut point data for 2023 is arbitrary and capricious and contrary to law.

111.    Defendants failed to engage in reasoned decision-making; to reasonably (or at all) explain their departure from CMS's own regulation; or to provide an adequate and reasonable explanation for their decision.

112.    Defendants' action flies in the face of the plain and unambiguous text of their own regulation and undermines the policy and purpose of that regulation to reduce Star Ratings swings that harm MA Plans and beneficiaries.

113.    Defendants acted unreasonably and contrary to law by deploying a methodology that is inconsistent with the approach mandated by their regulation, and was never disclosed to regulated parties – let alone adopted pursuant to any proper rulemaking proceedings.

114.    As a result, Defendants' decision is arbitrary, capricious, and otherwise not in accordance with the law in violation of 5 U.S.C. § 706(2)(A).

115.    Zing has suffered and will continue to suffer irreparable harm as a result of Defendants' violations of 5 U.S.C. § 706(2)(A).

116.    Zing is entitled to injunctive and declaratory relief to remedy Defendants' unlawful conduct, as well as all other relief as set forth in its Prayer for Relief.  *See* 5 U.S.C. § 705.

## COUNT II
### Declaratory Judgment

117.    Zing realleges and incorporates Paragraphs 1 through 106 as if fully set forth herein.

118.    CMS's calculation of the 2024 Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2).

119.    Zing is adversely affected and aggrieved by the calculation of its Star Ratings.

120.    An actual controversy has arisen and exists between Zing and Defendants

regarding Defendants' calculation of Zing's 2024 Star Ratings using simulated and rerun 2023

data.

121.    Zing requests a declaration from this Court under 28 U.S.C. § 2201 that

Defendants' calculation is arbitrary and capricious.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Zing prays that this Court vacate Zing's 2024 Star Ratings and

remand this matter to the agency for further consideration.  Additionally, Zing requests the Court

to:

1.    Adopt an expedited schedule to resolve the merits of this Complaint;

2.    Declare that:

- Defendants' rerunning of the 2023 cut points to calculate Zing's 2024 Star Ratings directly conflicts with CMS's regulatory requirements and is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A);

- Defendants must recalculate Zing's 2024 Star Ratings in compliance with CMS's final rule, specifically considering actual performance data.

3.    An injunction:

- Preventing Defendants from using Zing's 2024 Star Ratings in connection with any termination and intermediate sanction decisions.

4.    Award Zing its reasonable attorney's fees and costs, as permitted by law; and

5.    Grant such other further relief as this Court deems just and proper.

-19-

Dated: March 25, 2024

By: _____
Paul Werner (D.C. Bar #482637)
SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
2099 Pennsylvania Ave N.W., Suite 1000
Washington, D.C. 20006
Tel. 202-747-1900
pwerner@sheppardmullin.com

*Counsel for Zing Health, Inc.*