UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ZING HEALTH, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 24-855 (RBW) |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

Zing Health, Inc., Zing Health of Michigan, Inc., and Zing Health Consolidator, Inc. (collectively, the "plaintiffs" or "Zing Health"), bring this civil action against the United States Department of Health and Human Services ("HHS"); the Centers for Medicare & Medicaid Services ("CMS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; and Dr. Mehmet Oz, in his official capacity as Administrator of CMS (collectively, the "defendants"),[1] pursuant to the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 701–706. See First Amended Complaint ("Am. Compl.") at 1, ECF No. 18. Currently pending before the Court is the defendants' motion to dismiss the plaintiffs' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1). See Defendants' Motion to Dismiss Amended Complaint and Memorandum in Support Thereof ("Defs.' Mot.") at 1, ECF No. 20. Upon careful consideration

---

[1] Robert F. Kennedy, Jr. is the current Secretary of HHS and Dr. Mehmet Oz is the current Administrator of CMS, and, therefore, they are automatically substituted for their predecessors Xavier Becerra and Chiquita Brooks-LaSure, respectively, pursuant to Federal Rule of Civil Procedure 25(d).

of the parties' submissions,[2] the Court concludes for the following reasons that it must grant the defendants' motion to dismiss.

## I. BACKGROUND

### A. Factual and Procedural Background

The following allegations are derived from the plaintiffs' Amended Complaint unless otherwise specified. Under Medicare, senior citizens and individuals with disabilities "can receive coverage from the federal government directly or by enrolling in private health insurance plans that are reimbursed by the government[,]" and this latter option is known as "Medicare Advantage" or "Medicare Part C." Scan Health Plan v. Dep't of Health & Hum. Servs., No. 23-cv-3910 (CJN), 2024 WL 2815789, at *1 (D.D.C. June 3, 2024) (citations omitted). "Beneficiaries who choose either option may also choose to supplement their benefits by enrolling in a prescription drug benefit plan known as Medicare [Advantage-]Part D[,]" or "MA-PD" plans, id. (citing 42 U.S.C. § 1395w-101 et seq.), and these MA-PD plans "are also operated by private insurers[,]" id. (citing 42 U.S.C. § 1395w-101(a)(1)).

Zing Health is a private health insurance organization "founded in 2019 by physician entrepreneurs and a healthcare executive with the mission to address healthcare disparities among historically underserved populations[,]" Am. Compl. ¶ 7, as well as to "drastically improve health outcomes in diverse populations that have been chronically underserved[,]" id. ¶ 9. To accomplish this objective, Zing Health offers health insurance to Medicare beneficiaries through MA-PD contracts. See id. ¶ 10.

---

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Complaint ("Pls.' Opp'n"), ECF No. 22; and (2) the Defendants' Reply in Further Support of Defendants' Motion to Dismiss Amended Complaint ("Defs.' Reply"), ECF No. 24.

MA-PD contracts, such as Zing Health's contracts, receive annual Star Ratings from CMS, which administers the Medicare program. See id. ¶ 11. These Star Ratings, which are on a scale of five stars with half-star increments, see 42 C.F.R. § 4222.166(c), (d)(2)(iv), are "based on 'health and drug plan quality and performance measures[,]'" Am. Compl. ¶ 11, and are used by "Medicare beneficiaries . . . to evaluate and compare plans' quality performance, as assessed by CMS, when they shop for a Medicare Advantage plan[,]" id.

Star Ratings are also used to "determine MA-PD plans' eligibility to receive quality bonus payments and rebates that fund additional benefits for plans' Medicare members." Id. ¶ 12. If a Medicare Advantage plan receives a Star Rating decrease, the plan can "be disqualified from receiving quality bonus payments[.]" Id. ¶ 87. Additionally, if a Medicare Advantage plan receives less than three stars "on [a] . . . Part D [plan] for three years in a row," CMS may disqualify that plan from MA-PD. Id. ¶ 114.

"CMS must calculate the Star Ratings based on a clear and unambiguous methodology that includes the calculation of measure-specific 'cut points[,]'" id. ¶ 13; see 42 C.F.R. §§ 422.166(a), 423.186(a), which "are the dividing lies between one Star Rating and the next higher or lower Star Rating[,]" Am. Compl. ¶ 13. Relevant here, CMS has, in recent years, changed the way it calculates Star Ratings. "In 2020, CMS promulgated regulations that revised its Star Ratings methodology to include 'guardrails' that provide stability and predictability for MA-PD plans by reducing the fluctuation in the cut points used to calculate annual Star Ratings." Id. ¶ 14 (citing 42 C.F.R. §§ 422.162, 422.166, 423.182, 423.186). Further, CMS promulgated regulations to clean Tukey outliers—defined as "extreme outliers on the high and low ends of a data set[]"—from the raw data before calculating cut points. Id. ¶ 17. These changes were first implemented for the 2023 and 2024 Star Ratings, respectively. See Medicare and Medicaid

3

Programs; Policy and Regulatory Revisions in Response to the COVID-19 Public Health Emergency, 85 Fed. Reg. 19,230, 19,274–75 (Apr. 6, 2020); Medicare Program; Contract Year 2021 Policy and Technical Changes to the Medicare Advantage Program, Medicare Prescription Drug Benefit Program, and Medicare Cost Plan Program, 85 Fed. Reg. 33,796, 33,836 (June 2, 2020).

The plaintiffs contend that these changes had profoundly negative impacts on their MA-PD plans. See Am. Compl. ¶ 19. After having received only 2.5 Star Ratings in both 2022 and 2023, see id. ¶ 110, the "[plaintiffs'] 2024 Part D Star Rating remained low, and became the third and last data point used by CMS immediately to prohibit [the plaintiffs] from marketing and enrolling beneficiaries into its MA-PD plans and terminate [the plaintiffs'] contract from the Medicare Advantage Program effective December 31, 2024," id. ¶ 19, which the plaintiffs contend has harmed their beneficiaries and resulted in both reputational and economic harm to the plaintiffs themselves, see id. ¶¶ 19, 26–27.

In June 2024, after the plaintiffs filed their Complaint in this case, two other members of this Court concluded, in cases pursued by other plaintiffs, that CMS improperly calculated its 2024 Star Ratings and ordered CMS to recalculate those ratings in accordance with the relevant regulations. See generally Elevance Health, Inc. v. Becerra, 736 F. Supp. 3d 1 (D.D.C. 2024); Scan Health Plan, 2024 WL 2815789. In response to these orders, CMS "recalculated the 2024 Star Ratings[,]" Am. Compl. ¶ 139, including the plaintiffs' prior Star Ratings, see id.

CMS then issued a memorandum (the "CMS Memorandum") "announcing its intention to recalculate the . . . 2024 Star Ratings for 2025 quality bonus payment purposes." Id. ¶ 138; see also Am. Compl., Exhibit ("Ex.") 3 (Letter from Kathryn A. Coleman, Director, Medicare Drug & Health Plan Contract Administration Group, Center for Medicare, to Medicare

4

Advantage Organization Compliance Officers re: Update to 2025 Quality Bonus Payment Determinations (June 13, 2024) ("CMS Mem.")) at 1, ECF No. 18.  Specifically, the CMS Memorandum noted that CMS had "assigned all contracts the recalculated 2024 overall and/or summary Star Ratings if those recalculated ratings result[ed] in higher [Quality Bonus Payment] Ratings than what was previously assigned based on" the prior improper calculations.  Id. ¶ 32; see Am. Compl., Ex. 3 (CMS Mem.) at 1.

However, the CMS Memorandum did not discuss its intent to recalculate or remediate any other actions flowing from those improper calculations.  Instead, CMS issued a separate "notice that CMS [was] reversing its improper termination of Zing [Health]'s contract and [was] allowing Zing Health to submit a bid for the plan for 2025."  Am. Compl. ¶ 34; see Ctrs. for Medicare & Medicaid Services, Notice of Retraction of Termination and Intermediate Sanctions ("Retraction Notice") at 1, https://www.cms.gov/files/document/zingtermination-sanctionretraction06252024.pdf.[3]

**B.   Procedural Background**

The plaintiffs filed their original Complaint in this case on March 25, 2024.  See Complaint at 1, ECF No. 1.  Then, on July 19, 2024, following the rulings in Becerra and Scan Health Plan, and still unsatisfied with CMS's remediation of harms arising from the improper calculations of Star Ratings, the plaintiffs filed their Amended Complaint: (1) challenging CMS's calculation of the 2024 Star Ratings ("Count I"), see Am. Compl. ¶¶ 167–76; (2) challenging the adoption of the CMS Memorandum and its implementation ("Count II"), see id. ¶¶ 177–90; and (3) seeking a declaration that the adoption and implementation of the CMS Memorandum was unlawful under the APA ("Count III"), see id. ¶¶ 191–95.  However, the

---

[3] The Court takes judicial notice of the Retraction Notice posted on CMS's official website.  See Pharm. Rsch. & Mfrs. of Am. v. U.S. Dep't of Health & Hum. Servs., 43 F. Supp. 3d 28, 33 (D.D.C. 2014).

plaintiffs have subsequently represented that they have withdrawn Count I.  See Pls.' Opp'n at 7 n.4.

On September 11, 2024, the defendants filed their motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1).  See Defs.' Mot. at 1.  On October 25, 2024, the plaintiffs filed their opposition, see Pls.' Opp'n at 1, and the defendants filed their reply on November 15, 2024, see Defs.' Reply at 1.

## II.   STANDARD OF REVIEW

### A.   Federal Rule of Civil Procedure 12(b)(1)

"Federal [district] courts are courts of limited jurisdiction[,]" Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and therefore, "[a] motion for dismissal under [Federal Rule of Civil Procedure] 12(b)(1) 'presents a threshold challenge to the [C]ourt's jurisdiction[,]'" Morrow v. United States, 723 F. Supp. 2d 71, 75 (D.D.C. 2010) (Walton, J.) (quoting Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir. 1987)).  Thus, the Court is obligated to dismiss a claim if it "lack[s] . . . subject matter jurisdiction[.]"  Fed. R. Civ. P. 12(b)(1).  And, because "[i]t is to be presumed that a cause lies outside [the Court's] limited jurisdiction," Kokkonen, 511 U.S. at 377, the plaintiffs bear the burden of establishing by a preponderance of the evidence that a district court has subject matter jurisdiction, see Nurse v. Sec'y of Air Force, 231 F. Supp. 2d 323, 326 (D.D.C. 2002) (Walton, J.) (citations omitted).

In deciding a motion to dismiss based on lack of subject matter jurisdiction, the Court "need not limit itself to the allegations of the complaint."  Grand Lodge of the Fraternal Ord. of Police v. Ashcroft, 185 F. Supp. 2d 9, 14 (D.D.C. 2001).  Rather, the "[C]ourt may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."  Scolaro v. D.C. Bd. of Elections & Ethics, 104 F. Supp. 2d 18, 22

(D.D.C. 2000); see also Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005). Additionally, the Court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting [the] plaintiff[s] the benefit of all inferences that can be derived from the facts alleged[.]'" Am. Nat'l Ins. Co. v. Fed. Deposit Ins. Corp., 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394 F.3d 970, 972 (D.C. Cir. 2005)). However, "the [p]laintiff[s'] factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." Grand Lodge, 185 F. Supp. 2d at 13–14 (alterations in original) (citation and internal quotation marks omitted). And, the Court "need not accept bare legal conclusions nor unsupported inferences." Campaign Legal Ctr. v. Fed. Election Comm'n, No. 22-cv-3319 (CRC), 2024 WL 4263853, at *5 (D.D.C. Sept. 23, 2024) (citing Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002)).

### III.     ANALYSIS

**A.     Whether the Plaintiffs Have Established that They Have Article III Standing to Bring Their Claims**

As indicated above, the plaintiffs have withdrawn Count I—i.e., their challenge to CMS's calculation of the 2024 Star Ratings, see Pls.' Opp'n at 7 n.4—and therefore the Court's analysis of the plaintiffs' standing is limited to their challenge to the adoption and implementation of the CMS Memorandum.

The defendants argue that the Court should dismiss the plaintiffs' remaining claims in their Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because the plaintiffs did not suffer a cognizable injury-in-fact arising out of the adoption and implementation of the CMS Memorandum, and thus the plaintiffs have failed to establish that

they have Article III standing to bring these remaining claims. See Defs.' Mot. at 21. Specifically, the defendants argue that because CMS was under no obligation to reference the plaintiffs in the CMS Memorandum, which addressed the recalculation of Star Ratings in the context of quality bonus payments, and was not applicable to the plaintiffs, who were not affected by the recalculation of quality bonus payments. See id. Thus, according to the defendants, the CMS Memorandum's purported failure to reference the rescission of the plaintiffs' sanctions and termination—which was instead the subject of a separate notice—did not cause the plaintiffs to suffer a legally cognizable injury. See id. Further, the defendants argue that any other harms to the plaintiffs are no longer redressable due to the defendants' rescission of those sanctions and their termination. See id. at 22.

In response, the plaintiffs claim that they sufficiently alleged injuries-in-fact because (1) they have suffered competitive and reputational harms as a result of CMS's "erroneous termination and sanctions[,]" Pls.' Opp'n at 8 (citation omitted); and (2) the CMS Memorandum, rather than redressing these injuries, compounded them because it "failed to address the reputational and business harms caused by its flawed ratings, sanctions, and termination[,]" id. at 9. And, because the CMS Memorandum remains in effect, the plaintiffs argue that these harms are redressable by the Court despite the rescission of CMS's sanctions and termination. See id. at 10–11.

To reiterate, "[a]s the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." TransUnion LLC v. Ramirez, 594 U.S. 413, 430–31 (2021). To satisfy the standing requirement under Article III, "litigant[s] seeking to invoke the jurisdiction of a federal court must demonstrate that (1) [they] ha[ve] suffered an injury-in-fact (2) which is caused by, or is fairly traceable to, the defendant[s'] alleged unlawful conduct and

(3) which is likely to be redressed by a favorable decision of the court." Wyo. Outdoor Council v. U.S. Forest Serv., 165 F.3d 43, 48 (D.C. Cir. 1999) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "The absence of any one of these three elements[—injury-in-fact, causation, or redressability—]defeats standing." Newdow v. Roberts, 603 F.3d 1002, 1010 (D.C. Cir. 2010). "Moreover, the plaintiff[s] must demonstrate standing with respect to each claim and form of relief sought." Am. Freedom L. Ctr. v. Obama, 106 F. Supp. 3d 104, 108 (D.D.C. 2015) (Walton, J.) (citing Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 153 (2010)).

To establish an injury-in-fact, the plaintiffs must show that they have suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560; see also Spokeo v. Robins, 578 U.S. 330, 339–40 (2016) (counseling that a "particularized" injury is one that "affect[s] the plaintiff[s] in a personal and individual way" and a "concrete" injury is a "real, and not abstract" injury that "must actually exist" (internal quotation marks omitted)).

For the following reasons, the Court concludes that the plaintiffs have failed to allege that they suffered an injury-in-fact based on the CMS Memorandum. The plaintiffs make several arguments in support of their position that they have established that they have suffered injuries-in-fact for the purposes of Article III standing resulting from the defendants' allegedly unlawful actions, all of which are unavailing. First, the plaintiffs contend that they have established that they were "uniquely harmed by CMS's erroneous termination and sanctions[,]" Pls.' Opp'n at 8, because those actions prohibited the plaintiffs from "marketing to and enrolling [ ] beneficiaries and even permitted over 1,000 current enrollees to disenroll from [the plaintiffs'] plan[,]" id. at 8–9 (citing Am. Compl. ¶ 117 n.9), therefore resulting in "irreparable harms to [the plaintiffs'] reputation and business[,]" id. at 9. Second, the plaintiffs assert that they suffered harm resulting

9

from the CMS Memorandum because, "[r]ather than redress [the plaintiffs'] reputational harms, the [CMS] Memorandum . . . has compounded them[,]" id., in that, by omitting any reference to the plaintiffs, the CMS Memorandum "failed to address the reputational and business harms caused by its flawed ratings, sanctions, and termination[,]" id., and thus arbitrarily excluded the plaintiffs from obtaining redress or relief on par with that provided to organizations affected in the quality bonus payment context.

To be sure, the plaintiffs allege that they suffered economic and reputational harm resulting from CMS's erroneous 2024 Star Ratings calculation and the resulting termination and sanctions. However, apparently recognizing that their challenge to the 2024 Star Ratings calculation is now moot due to CMS's recalculation of those ratings, the plaintiffs have withdrawn their challenge to those calculations. See Pls.' Opp'n at 7 n.4. Similarly, the plaintiffs do not directly challenge the termination and sanctions stemming from the erroneous 2024 Star Ratings, see generally Am. Compl., and those actions have also now been retracted, as the plaintiffs admit, see Pls.' Opp'n at 6.

Instead, the plaintiffs contend that their "reputation has been and continues to be harmed by the limited relief the agency arbitrarily and discriminatorily afforded certain plans[,]" id. at 9, because the CMS Memorandum provided relief to organizations in the quality-bonus-payment context, but not to the plaintiffs in the context of their termination and sanctions, see id. However, as the defendants note, the plaintiffs fail to allege any concrete harm arising from the CMS Memorandum itself, as opposed to the harms resulting from the now-retracted 2024 Star Ratings, termination, and sanctions. As indicated above, the CMS Memorandum was issued to all Medicare Advantage organizations regarding its recalculation of 2024 Star Ratings for the purposes of quality bonus payments. See Am. Compl., Ex. 3 (CMS Mem.) at 1. It did not refer

10

to any organizations by name, nor did it refer to other actions it would take based on the retraction of the 2024 Star Ratings. See generally id. And, because the plaintiffs were the sole MA-PD plan to have been issued a termination and sanctions resulting from the 2024 Star Ratings, the defendants notified the plaintiffs by separate notice—which CMS also posted publicly on its government website—that those actions were retracted, and that the plaintiffs' Star Ratings would be recalculated. See Ctrs. for Medicare & Medicaid Services, Notice of Retraction of Termination and Intermediate Sanctions ("Retraction Notice") at 1, https://www.cms.gov/files/document/zingtermination-sanctionretraction06252024.pdf.

Unsatisfied with that separate notice, the plaintiffs argue that the defendants have inadequately mitigated the ongoing harm to their business and reputation by omitting the plaintiffs from the CMS Memorandum. See Pls.' Opp'n at 9. However, the plaintiffs have failed to allege that this purportedly inadequate mitigation—i.e., the retraction of the termination and sanctions by separate notice rather than as part of the seemingly unrelated CMS Memorandum—resulted in "an invasion of a legally protected interest" that is "concrete and particularized[.]" Lujan, 504 U.S. at 560. Nor have the plaintiffs identified any legal right that the defendants violated by omitting the plaintiffs from the CMS Memorandum.

In response to the defendants' arguments relating to the CMS Memorandum, the plaintiffs merely reiterate that the now-retracted termination and sanctions were a "scarlet letter[,]" Pls.' Opp'n at 9, that resulted in reputational harms to their businesses, see id. at 9–10. In making this claim, the plaintiffs continue to conflate the harms they have alleged resulting from the now-retracted—and at this point unchallenged—Star Ratings, termination, and sanctions, with any harm allegedly resulting from the CMS Memorandum itself, which is insufficient to carry their burden of establishing that they have Article III standing "with respect

11

to each claim and form of relief sought." Am. Freedom L. Ctr., 106 F. Supp. 3d at 108 (citing Monsanto Co., 561 U.S. at 153).[4]

Thus, because the plaintiffs have not sufficiently shown that they suffered an injury-in-fact resulting from the adoption and implementation of the CMS Memorandum, the plaintiffs have not met their burden of establishing that they have Article III standing. See TransUnion, 594 U.S. at 430–31 ("[T]he plaintiffs bear the burden of demonstrating that they have standing."); Newdow, 603 F.3d at 1010 ("The absence of any one of these three elements[—injury-in-fact, causation, or redressability—]defeats standing.").[5]

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that it must grant the defendants' motion to dismiss for lack of subject matter jurisdiction.

---

[4] The plaintiffs do not dispute that any lingering reputational harm arising from the retracted Star Ratings, termination, and sanctions is insufficient to establish Article III standing under these circumstances. See generally Pls.' Opp'n; see also Foretich v. United States, 351 F.3d 1198, 1212 (D.C. Cir. 2003) (concluding that "where reputational injury is the lingering effect of an otherwise moot aspect of a lawsuit, no meaningful relief is possible and the injury cannot satisfy the requirements of Article III"). Instead, the plaintiffs argue that because the CMS Memorandum is an "unexpired and unretracted government action[,]" Pls.' Opp'n at 9 (quoting Foretich, 351 F.3d at 1213), their reputational injuries are actionable. However, as the Court has now concluded, the plaintiffs have failed to allege any injury-in-fact resulting from the CMS Memorandum itself.

[5] For the same reasons, the Court concludes that the plaintiffs have failed to establish that they are entitled to their declaratory relief, as set forth in Count III. Because "the Declaratory Judgment Act 'is not an independent source of federal jurisdiction[,]" C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002) (quoting Schilling v. Rogers, 363 U.S. 666, 677 (1960)), "the availability of [declaratory] relief presupposes the existence of a judicially remediable right[,]" id. (quoting Schilling, 363 U.S. at 677). Relevant here, "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." California v. Texas, 593 U.S. 659, 672 (2021) (citing MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126–27 (2007)). Having now concluded that the plaintiffs have failed to establish that they have Article III standing to bring any of their remaining claims in this case, the Court concludes that there is no basis for sustaining this action, as is required for the Court to grant the plaintiffs the declaratory relief they seek. See id. (citing MedIummune, 549 U.S. at 126–27).

**SO ORDERED** this 30th day of September, 2025.[6]

REGGIE B. WALTON<br>
United States District Judge

---

[6] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.